## APPEAL OF ROSCOE H. ALDRICH.

Docket No. 3301. Submitted July 10, 1925. Decided February 19, 1926.

1. By the terms of an agreement between the taxpayer and a corporation, the corporation agreed to compensate the taxpayer for entering into a contract with another corporation and becoming its general manager for a period of five years, by depositing in escrow certain shares of stock to be delivered to the taxpayer at the expiration of said five years upon the performance of certain conditions, the dividends payable on the stock during the escrow period to be paid to the taxpayer. *Held*, that the taxpayer was not a stockholder during the escrow period and the dividends on the escrow stock constituted compensation for services and not dividends as to him.

2. The evidence fails to establish that certain stock did not have a fair market value at the time of its receipt in 1919, and the Commissioner's determination of such value is approved.

*Lester H. Woolsey Esq.*, for the taxpayer.
*Lee I. Park, Esq.*, for the Commissioner.

Before MARQUETTE and MORRIS.

The questions presented are whether certain amounts received by the taxpayer from the Aldrich Pump Co. during 1918 constituted income subject to the normal tax, and whether certain stock received in 1919 had a fair market value and was taxable as income in that year.

### FINDINGS OF FACT.

The taxpayer is an individual residing at Allentown, Pa. For 12 years prior to 1914 he was employed by the Allentown Rolling Mills, a corporation organized under the laws of Pennsylvania, and was in charge of the department concerned with the development and manufacture of electric pumps.

The taxpayer was the inventor of an electric pump manufactured by the rolling mills, the patents for which had been taken out in his name, but which, before 1914, had been transferred to that company, with the exception of one patent, which was transferred to the Aldrich Pump Co. in 1914.

On April 7, 1914, the taxpayer entered into an agreement with the Allentown Rolling Mills, which provided as follows:

This agreement made the 7th day of April, A. D. 1914, by and between The Allentown Rolling Mills, a corporation of the State of Pennsylvania, party of the first part, and Roscoe H. Aldrich, of Allentown, Lehigh County, Pennsylvania, party of the second part.

Whereas the party of the first part owns a plant at Allentown, Lehigh County, Pennsylvania, where it has conducted the business of manufacturing pumps and other hydraulic machinery under an agreement dated April 26, 1909, between itself, The Birdsboro Steel Foundry and Machine Company and said Aldrich;

And whereas the parties to said agreement dated April 26, 1909 have agreed to terminate it on April 30, 1914;

And whereas the party of the first part desires to provide for the continuation at its plant at Allentown of its business of manufacturing pumps and other hydraulic machinery heretofore manufactured by it under the aforesaid agreement, as well as the business of manufacturing pumps heretofore conducted by the Birdsboro Steel Foundry and Machine Company under said agreement; and for such purpose to incorporate a company which shall take over and purchase from the party of the first part that portion of its plant, buildings and tracks used in the manufacture of said pumps, and to provide that said Aldrich be the General Manager of said new Company;

Now, therefore, this agreement witnesseth, that for and in consideration of the mutual covenants hereinafter set forth, as well as of other good and valuable considerations, the parties hereto do bind themselves, their successors, executors, and administrators as follows:

1. Party of the first part hereby agrees that it will cause to be incorporated prior to May 1st, 1914, under the laws of Pennsylvania, a Company under the name of The Aldrich Pump Company, with a capital of Three hundred and fifty thousand dollars ($350,000), consisting of three thousand five hundred (3,500) shares of stock of the par value of One hundred dollars ($100.) each; and that in exchange for three thousand four hundred and ninety-five shares (3,495) of said stock it will grant, sell, assign and set over to The Aldrich Pump Company the plant and about ten (10) acres of land now occupied by the buildings, tracks, etc., of the pump department of The Allentown Rolling Mills; all the buildings, apparatus, machinery and equipment of said department; the raw materials, unfinished and finished work; the then existing accounts receivable and cash, in excess of bills and accounts payable, and the good will of the entire business of its pump department.

II. The party of the first part agrees that it will cause The Aldrich Pump Company to enter into an agreement with Aldrich, and Aldrich agrees to enter into such agreement, as follows:

(1) The Aldrich Pump Company will engage Aldrich as General Manager of its plant and business at Allentown for a period of five (5) years from May 1st, 1914, with the option to it of renewal for another period of five (5) years, such option to be exercised in writing served upon Aldrich at least ninety (90) days prior to May 1st, 1919. The General Manager shall have charge of the engineering, manufacturing and sales departments of the Company, subject only to the direction and supervision of the President and Board of Directors or Executive Committee of The Aldrich Pump Company, with the right on the part of said Aldrich to hire and discharge any and all employees in said engineering, manufacturing and sales departments. The keeping of accounts shall be the duty of the Secretary and Treasurer, to whom the office force shall be directly responsible and who shall have exclusive power to hire and discharge those in the office force. The Secretary and Treasurer must have the accounts so kept as to furnish at all times to the General Manager such information as the General Manager deems necessary, and must at all times on reasonable notice give to the General Manager such details, information and figures regarding any part of the business of

The Aldrich Pump Company as he may ask for. The purchasing of materials and supplies shall be the duty of the Purchasing Agent, who shall be appointed by the Board of Directors and who may be the same person as the Secretary and Treasurer. The character and quality of materials and supplies purchased for the Company must be satisfactory to the General Manager.

(2) The Aldrich Pump Company will pay Aldrich a salary of Two hundred and fifty dollars ($250) per month payable on the first of each month for the immediately preceding month.

(3) The Aldrich Pump Company will promptly, after its organization, apply from its working capital ten thousand dollars ($10,000) in the purchase of patterns, templates, jigs, etc., under an agreement between The Allentown Rolling Mills, its successors and assigns and The Birdsboro Steel Foundry and Machine Company, dated the 7th day of April, 1914, and will apply from its working capital Twenty-five thousand dollars ($25,000) additional in the extension of the foundry and machine shop and the purchase of new tools.

(4) Aldrich agrees that he will accept the position of General Manager of The Aldrich Pump Company for five (5) years under the covenants and conditions herein named, including the option to the Company to renew his engagement for a further period of five (5) years for the consideration recited in this contract, and he agrees that he will give his exclusive and best engineering services and his best services as manager of sales and as General Manager of The Aldrich Pump Company, to the end that the business of said Company may be as large and profitable as possible.

III. The party of the first part further agrees to compensate Aldrich as follows:

Upon the signing of this agreement it will deliver into the hands of the Guarantee Trust Company of Philadelphia in escrow five hundred shares (500) of the capital stock of The Aldrich Pump Company, upon the following conditions:

(a) All dividends declared upon these shares from time to time shall be paid to Aldrich.

(b) If at the end of the five years, the period of his engagement, Aldrich is still General Manager of the Aldrich Pump Company and the earnings of the Company· during the last year of said five year period, over and above interest charges on borrowed capital, if any, maintenance and running expenses (not to include replacements, purchases of new machinery, extensions and improvements to plant), and a reasonable depreciation charge, but without deduction for interest on capital invested, shall have amounted to not less than 6% on its capital stock of $350,000, then the 500 shares of stock shall be transferred and delivered to Aldrich as his absolute property. But if during said five year period Aldrich shall for any cause have left the Aldrich Pump Company, or if during the last year of said period said earnings have not amounted to 6% on the capital stock of $350,000, the 500 shares of stock are to be transferred and delivered to the Allentown Rolling Mills as its absolute property.

*Provided, however,* that if during the last year of said five year period the company shall have met with substantial loss through fire, strike or similar causes beyond its control, or through a general business depression in the trade, the earnings for the year next preceding such fire, strike or depression shall be taken as the test under this article.

(c) It is expressly agreed, however, that should Aldrich die at any time within said five year period and is at the time of his death General Manager of The Aldrich Pump Company, the Allentown Rolling Mills will either pay forthwith Fifty thousand dollars ($50,000) cash to the Estate of said Aldrich,

or, at the option of the Allentown Rolling Mills, will deliver said five hundred shares (500) of stock of The Aldrich Pump Company to his Estate as its absolute property; and this provision shall be effective irrespective of the earnings of The Aldrich Pump Company.

(d) The Allentown Rolling Mills shall quarterly, on request of Aldrich, pay to him an amount not exceeding fifty per cent (50%) of the net earnings applicable to dividends on 5/35 of the stock of The Aldrich Pump Company as shown on its books at the close of each quarter, such payment or payments to be deducted without interest from the amount payable to Aldrich on the next dividend thereafter declared. For the purposes of this subdivision (d), it is understood and agreed that in ascertaining the net earnings applicable for dividends, there shall be deducted from the gross revenue all expenses of the business including interest on borrowed capital, if any, and all replacements and purchases of new machinery, and extensions of and other improvements to the plant during the current quarter or year as the case may be, but nothing shall be deducted for interest on capital invested.

IV. The party of the first part hereby grants and gives to Aldrich the option to buy from it at par at any time within five years from the date of the incorporation of The Aldrich Pump Company any number not exceeding one hundred (100) shares of the capital stock of that Company.

V. The party of the first part agrees with Aldrich that if at any time during the period in which he is General Manager of The Aldrich Pump Company it should sell its stock of that Company, it will make as a condition of such sale that the purchaser shall pay to Aldrich or to his Estate for the five hundred (500) shares of stock of said Company set aside for his account as above set forth, the same price per share as shall be received by the party of the first part for its stock, and if, at the time, the shares set aside for Aldrich are still in escrow, they are to be at once transferred to Aldrich so that he may be able to make delivery of them to such purchaser.

VI. The party of the first part agrees that it will cause The Aldrich Pump Company to enter into an agreement with Aldrich, and Aldrich agrees to enter into such agreement, as follows:

If at any time during the period in which Aldrich is General Manager of the Aldrich Pump Company he shall desire to make application for a patent or patents relating to pumps or other machinery of the kind manufactured by the Aldrich Pump Company, he shall first submit the drawings and specifications for such patent or patents to the President of the Company, and if the Company desires to become the owner of such patent or patents it shall pay all the reasonable costs and expenses for obtaining the same, and Aldrich shall thereupon assign to the Company the application or letters patent.

VII. The party of the second part agrees that the party of the first part may, if it so desire, take out forthwith a life insurance policy or policies on him for fifty thousand dollars ($50,000) and keep the same in force during the five or ten years covered by his engagement with The Aldrich Pump Company, and party of the first part is to pay all premiums and expenses and to receive all dividends and payments under the policy or policies in case of death.

Pursuant to the contract of April 7, 1914, the Aldrich Pump Co. was incorporated under the laws of Pennsylvania, and the Allentown Rolling Mills received 3,495 shares of the stock in exchange for assets transferred to the Pump Co. Certificates for 500 shares of that stock were placed in escrow with the Guaranty Trust Co. of

Philadelphia, to be held in accordance with the provisions of the said contract.

From 1914 to May, 1919, the stock of the Aldrich Pump Co. continued to be owned by the Allentown Rolling Mills and held by the escrow agent. The stock of the Pump Co. was closely held, none of it being sold or quoted on any stock exchange or bought or sold by brokers or individuals.

On May 1, 1914, the taxpayer entered into a contract with the Aldrich Pump Co., which provided as follows:

Memorandum of agreement made this first day of May, 1914, by and between The Aldrich Pump Company, a Corporation of the State of Pennsylvania, hereinafter called the Company, party of the first part, and Roscoe H. Aldrich, of Allentown, Pennsylvania, hereinafter called Aldrich, party of the second part.

Whereas, the Company desires to employ Aldrich as General Manager of its plant and business, and Aldrich desires to give his best services to the Company in such capacity;

And Whereas, it is the purpose and intention of the parties hereto in so doing to carry into effect the agreement made between The Allentown Rolling Mills, a corporation of the State of Pennsylvania, and said Roscoe H. Aldrich, dated the 7th day of April, 1914;

Now this agreement witnesseth, that for and in consideration of the mutual covenants hereinafter set forth, as well as for other good and valuable considerations, the parties hereto do bind themselves as follows:

(1) The Company agrees to engage and hereby does engage Aldrich as General Manager of its plant and business at Allentown for a period of five (5) years from May 1st, 1914, with the option to it of renewal for another period of five (5) years, such option to be exercised in writing served upon Aldrich at least ninety (90) days prior to May 1st, 1919. The General Manager shall have charge of the Engineering, manufacturing and sales departments of the Company, subject only to the direction and supervision of the President and Board of Directors or Executive Committee of the Company, with the right on the part of Aldrich to hire and discharge any and all employees in said Engineering, manufacturing and sales departments. The keeping of accounts shall be the duty of the Secretary and Treasurer to whom the office force shall be directly responsible and who shall have the exclusive power to hire and discharge those in the office force. The Secretary and Treasurer must have the accounts so kept as to furnish at all times to the General Manager such information as the General Manager deems necessary, and must at all times on reasonable notice give to the General Manager such details, information and figures regarding any part of the business of the Company as he may ask for. The purchasing of materials and supplies shall be the duty of the Purchasing Agent, who shall be appointed by the Board of Directors and who may be the same person as the Secretary and Treasurer. The character and quality of materials and supplies purchased for the Company must be satisfactory to the General Manager.

(2) The Company will pay Aldrich a salary of Two hundred and fifty dollars ($250) per month payable on the first of each month for the immediately preceding month.

(3) The Company will promptly, after its organization, apply from its working capital ten thousand dollars ($10,000) in the purchase of Patterns,

templates, jigs, etc. under an agreement between The Allentown Rolling Mills, its successors and assigns and The Birdsboro Steel Foundry & Machine Company, dated the 7th day of April, 1914, and will apply from its working capital twenty-five thousand dollars ($25,000) additional in the extension of the foundry and machine shop and the purchase of new tools.

(4) Aldrich agrees that he will accept the position of General Manager of the Company for five (5) years under the covenants and conditions herein-named, including the option of the Company to renew his engagement for a further period of five (5) years for the consideration recited in this contract, and he agrees that he will give his exclusive and best engineering services and his best services as manager of sales and as General Manager of the Company, to the end that the business of the Company may be as large and profitable as possible.

(5) The Company shall quarterly, on request of Aldrich, pay to him an amount not exceeding fifty per cent (50%) of the net earnings applicable to dividends on 5/35 of the stock of the Company as shown on its books at the close of each quarter, such payment or payments to be deducted without interest from the amount payable to Aldrich on the next dividend thereafter declared. For the purpose of this subdivision (5), it is understood and agreed that in ascertaining the net earnings applicable for dividends, there shall be deducted from the gross revenue all expenses of the business including interest on borrowed capital, if any, and all replacements and purchases of new machinery, extensions of and other improvements to the plant during the current quarter or year as the case may be, but nothing shall be deducted for interest on capital invested.

(6) If at any time during the period in which Aldrich is General Manager of the Company he shall desire to make application for a patent or patents relating to pumps or other machinery of the kind manufactured by the Company, he shall first submit the drawings and specifications for such patent or patents to the President of the Company, and if the Company desires to become the owner of such patent or patents it shall pay all the reasonable costs and expenses for obtaining the same, and Aldrich shall thereupon assign to the Company the application or letters patent.

In accordance with this agreement, Aldrich became general manager of the company for five years from May 1, 1914, and drew a salary of $250 a month throughout the period of that contract. After May 1, 1914, the taxpayer held no position and had no connection with the Allentown Rolling Mills, except under the contract of April 7, 1914.

The taxpayer held the position of general manager in the Aldrich Pump Co. until December 31, 1924.

In the period between 1914 and 1919, while the 500 shares of stock of the Pump Co. were in escrow, the taxpayer exercised all the rights of beneficial ownership in the stock, by voting as a stockholder at various stockholders' meetings, either in person or by proxy, without objection on the part of anyone, by acting as one of the directors of the corporation, and by receiving all dividends on said stock directly from the Aldrich Pump Co.

The taxpayer did not own any other shares of the stock of the Pump Co. besides the 500 shares, and he did not hold as director any qualifying shares of stock.

The taxpayer received dividends from the Aldrich Pump Co. on the stock in escrow in the years 1915 to 1920, inclusive. He returned for taxation as dividends the dividends received from the Aldrich Pump Co. on the stock in escrow in the years in which said dividends were received. The Commissioner took no exception to the return of these dividends as dividends, except for the year 1918, when he held that the dividends should have been returned as compensation to the taxpayer for services.

Said dividends, during the escrow period, were paid to taxpayer directly by the Aldrich Pump Co. and not through the medium of the Allentown Rolling Mills. The dividends were charged on the books of the Pump Co. as dividends and not as expenses.

The taxpayer requested, and received from time to time, certain advances on dividend payments from the Aldrich Pump Co., beginning in 1915 up to and including 1919, the year in which he actually received the stock certificate, which advances were charged by the Aldrich Pump Co. against the taxpayer, and said charges were canceled by deductions from dividends subsequently declared.

Upon the termination of the escrow period, May 1, 1919, the certificates for shares of stock were delivered to the taxpayer as provided in the agreement of April 7, 1914. In his return for 1919, the taxpayer included a statement to the effect that he had received said shares of stock but that the stock had no market value and that it was impossible to obtain even approximately its market value at that time.

Dividends at the rate of 10 per cent per annum were paid by the Aldrich Pump Co. for the years 1915 to 1918, both inclusive, and a dividend of 12 per cent was paid in 1919. No dividends were paid after the year 1920.

The Commissioner included in taxable income for the year 1919 the sum of $50,000, as representing the value of 500 shares of stock of the Aldrich Pump Co.

The taxpayer made no effort to sell the said shares of stock during the year 1919, for the reason that at the time he was general manager of the Aldrich Pump Co., and closely associated with the Allentown Rolling Mills interests, and on account of his relations with the officers of that corporation, and because any effort on his part to sell the stock would in his opinion have resulted in a break with his associates, charges of abandoning the business and the probable loss of his position.

The taxpayer endeavored to dispose of his stock in 1923 and 1924. He offered to sell it to a director of the Allentown Pump Co. who owned the controlling interest in that company, but who refused to make any offer on the stock. In 1924 he attempted to borrow money on the stock as collateral from two banks, which refused to make a loan on the stock because he could not show to the directors that it had a market value. Both banks were familiar with the stock and the condition of the company, as it had theretofore applied to them for financial assistance. The banks informed the taxpayer that they could not make any loan on the taxpayer's stock and could not have loaned any money on it at any time.

The taxpayer is not now an employee of the Aldrich Pump Co. or the Allentown Rolling Mills, having been forced out of his position as general manager in the former company on December 31, 1924, because of certain disagreements.

During the year 1918 the taxpayer received $6,000, representing dividends declared on the escrow stock, which amount was reported by him in his return for that year as dividends subject only to the surtax. The Commissioner subjected this amount to taxation at the normal tax rates as having been compensation for services rendered.

### DECISION.

The determination of the Commissioner is approved.

### OPINION.

MARQUETTE: We have two questions for decision herein: (1) Whether the amount of $6,000 in dividends on the stock held in escrow, received by the taxpayer in 1918, constituted a dividend to him under the circumstances above set forth, and (2) whether the 500 shares of stock of the Aldrich Pump Co., received by him in 1919, had a fair market value at that time and were taxable as income in that year. We will consider these questions in their order.

By the terms of the agreement the Allentown Rolling Mills agreed to compensate Aldrich for entering into a contract with the Aldrich Pump Co. to act as general manager for a period of five years by delivering in escrow 500 shares of the capital stock of the Pump Co., upon the conditions that all dividends declared upon those shares from time to time should be paid to him, and at the end of five years, if the conditions therein named had been performed, the 500 shares should be transferred and delivered to him as his absolute property. It appears that Aldrich entered into an agreement with the Aldrich Pump Co. in conformity with the above-named agreement, acting as its general manager during the five-year period and otherwise performing the conditions of the agree-

ment. He acted as a director of the company and voted the escrow stock at stockholders' meetings without objection and held no other shares of stock to qualify him as a director.

It is a general rule of law that where stock is deposited in escrow, to be delivered upon the performance of certain conditions, dividends declared before such performance belong to the vendor. 6 Fletcher Enc. Corps., section 2701. There can be no doubt but that parties can by agreement provide to whom dividends shall be paid, and the effect of this contract was to assign the future dividends to the taxpayer. The right to receive dividends, however, is an incident of stock ownership, and the transfer of such a right does not operate to constitute the person to whom the right is assigned a stockholder.

The contract with the Rolling Mills did not provide that Aldrich should have the right to vote the stock held in escrow. It appears that the stock was voted by him at stockholders' meetings without objection, but this fact would not constitute him a stockholder, for here again the right to vote stock is an incident of ownership which may by contract be given to another; nor do we think the fact that he acted as director of the Pump Co. could make him a stockholder therein if he was not such in fact. Looking to the agreement, or what was done under it by the parties thereto, we are unable to conclude that the taxpayer was a stockholder of the Pump Co. prior to the transfer and delivery to him of the escrow stock in 1919. *Appeal of James R. Lister*, 3 B. T. A. 475.

The Revenue Act of 1918 defines a dividend as follows:

Sec. 201. (a) That the term "dividend" when used in this title (except in paragraph (10) of subdivision (a) of section 234) means (1) any distribution made by a corporation, other than a personal service corporation, to its shareholders or members, whether in cash or in other property * * * out of its earnings or profits accumulated since February 28, 1913, * * *.

The taxpayer not being a stockholder of the Pump Co., he does not come within the terms of this section, and we conclude that the amounts received in 1918 did not constitute dividends as to him. We are of opinion that, by the very terms of the contract, the payment of the dividends to him was intended to be and was compensation for his services to be rendered to the Pump Co. and that the Commissioner properly so held.

On the second question, the taxpayer does not contend that the transfer and delivery of the stock in 1919 would not constitute income to him in that year to the extent of its fair market value. His claim is that the stock had no fair market value at that time and that, therefore, the determination of any gain must be postponed until the stock had been disposed of by sale.

The evidence does not show the value of the assets of the Pump Co. It does disclose, however, that the company paid dividends of

10 per cent in the years from 1915 to 1918, and that in the year 1919 a dividend of 12 per cent was paid. No effort was made by the taxpayer during the year 1919 to sell the stock and there were no other sales. The stock of the Pump Co. was held in its entirety by the Rolling Mills and Aldrich, and it was not until 1923 that Aldrich offered to sell his stock to the managing director of the Rolling Mills. Again, in 1924, he sought to sell the stock to the same party, who declined to make any offer therefor. The evidence further discloses that during 1924 the taxpayer made efforts at two local banks to borrow money on this stock but that they declined to make any loans on the security thereof, for the reason that they would not be able to satisfy their boards of directors that the stock had a market value.

We do not think this evidence of efforts to sell the stock to the same person in 1923 and 1924 and the failure to secure loans in 1924 has any material bearing on the question of whether the stock had a fair market value in 1919. In the first place, it is too remote, and, further, the facts disclose that no dividends were paid by the company after 1920, which would necessarily have a material influence on the question of fair market value in 1923 and 1924. Assuming that the evidence establishes that the stock had no fair market value in 1923 and 1924, it does not establish that the stock had no fair market value at the time of its receipt in 1919. The Commissioner determined that the stock had a fair market value in 1919 of $100 per share, and, in view of the fact that dividends of 10 per cent per annum were paid on this stock over a period of four years immediately preceding the year of receipt, and a dividend of 12 per cent was paid in that year, there is certainly some evidence to support his determination. We must therefore approve the action of the Commissioner.